UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SHARON ROSECRANS, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | )    1:16-cv-00452-JAW |
| | ) |
| AIRAMEDIC, LLC, | ) |
| | ) |
|     Defendant. | ) |

**ORDER**

Following the entry of a default in favor of the plaintiffs and against the defendant in this case, the Court held a damages hearing at which both plaintiffs, a mother and daughter, testified. The defendant failed to appear. In light of its significant concerns about the credibility of the mother, the Court awards her only nominal damages. In light of the credible but limited damages sustained by the daughter, the Court awards her $1,000.00.

**I.    PROCEDURAL BACKGROUND**

On September 6, 2016, Sharon Rosecrans and Lisa Weeks filed a complaint against Airamedic, LLC (Airamedic), claiming that Airamedic was using their images for commercial purposes, that Airamedic failed to obtain their authority to do so, and that Airamedic failed to respond to their demand that it stop doing so. *Compl.* (ECF No. 1). The Plaintiffs demand damages "sufficiently large to compensate for damages they have suffered as a result of Defendant's conduct including, but not limited to, damages for general and non-economic damages, economic damages, pre-judgment

and post judgement (sic) interest, lost wages, punitive damages, costs of this suit, including reasonable attorney fees and costs, injunctive relief and such further relief the Court may deem proper." *Id.* at 3–4.

The Plaintiffs duly served a copy of the Complaint and Summons on Airamedic on September 17, 2016. *Aff. of Service* (ECF No. 4). On October 17, 2016, after Airamedic failed to respond to the lawsuit, the Plaintiffs moved for default judgment against it, and on October 24, 2016, the Plaintiffs filed a motion for entry of default against Airamedic. *Pls.' Mot. for Default J.* (ECF No. 5); *Pls.' Mot. for Entry of Default* (ECF No. 6). On October 24, 2016, the Clerk entered default against Airamedic. *Order Granting Mot. for Entry of Default* (ECF No. 7).

On October 25, 2016, the Court dismissed the Plaintiffs' motion for default judgment without prejudice. *Order Dismissing Mot. for Default J.* at 3 (ECF No. 8). The Court explained that because the Plaintiffs were not alleging a sum certain, the Court "requires plaintiffs to appear before it at a scheduled hearing and make the case for their damage claims by presentation of evidence." *Id.* at 2. The Court also noted that "once the hearing date, time and place have been scheduled, the Court requires the plaintiffs to notify the defaulted defendant so that if the defendant wishes to do so, it may appear and contest damages." *Id.* at 2–3.

On November 22, 2016, the Plaintiffs filed a second motion for default judgment seeking "$36,500.00 plus per diem each." *Pls.' Mot. for Default J.* at 2 (ECF No. 9) (*Pls.' Second Default J. Mot.*). The Court dismissed without prejudice the second motion, explaining that Plaintiffs did not comply with the Court's October 25,

2016 order requiring the Plaintiffs to appear at a scheduled hearing to make the case for their damages claim by presentation of evidence and to notify the defaulted defendant of the hearing once it has been scheduled. *Order Dismissing Second Mot. for Default J.* at 2 (ECF No. 10). After some delay, on December 28, 2016, the Court set a damages hearing for January 20, 2017 at 11:00 a.m. *Notice of Hr'g* (ECF No. 13).

On January 20, 2017, the Court held a damages hearing in the United States District Court in Bangor, Maine. *Min. Entry* (ECF No. 15). The Plaintiffs failed to comply with the Court's Order dated October 25, 2016, which required them to give prior notice of the hearing to Airamedic. However, at the Court's direction, after the hearing, on January 24, 2017, the Plaintiffs sent Airamedic a Notice of Opportunity for Hearing on Damages, indicating that the Court held a hearing on damages on January 20, 2017 and that Airamedic had the right to appear at the hearing and contest damages upon notifying the Court and Plaintiffs' counsel within fourteen days of the receipt of the notice. *Notice of Opportunity for Hr'g on Damages* (ECF No. 19); *id.* Attach. 1 *Certified Mail Receipt*. Airamedic received the Notice of Opportunity for Hearing on Damages by certified mail on January 27, 2017. *Certified Mail, Return Receipt* (ECF No. 20). More than fourteen days have passed since Airamedic's January 27, 2017 receipt of the notice of opportunity for hearing and the Court has received no response from Airamedic.

## II.   JURISDICTION

As of September 6, 2016, the date of the filing of the Complaint, Sharon Rosecrans was a resident of Fort Fairfield, Maine, Lisa Weeks was a resident of Bradley, Maine, and Airamedic was a corporation operating a commercial business in St. Petersburg, Florida.  *Compl.* (ECF No. 1); *Pls.' Mot. for Default J.* (ECF No. 5).  This Court has diversity jurisdiction under 28 U.S.C. § 1332.

### III.    THE JANUARY 20, 2017 DAMAGES HEARING

Sharon Rosecrans and Lisa Weeks appeared at the January 20, 2017 damages hearing and testified on their own behalf; Airamedic did not appear at the hearing.

#### A.    The Airamedic Brochure

The Plaintiffs introduced into evidence as Exhibit One an Airamedic brochure. *Pls.' Ex.* 1.  The brochure is about seven and a half by ten inches and is in color.  It consists of three equal-sized panels.  At the top of the middle panel is a photograph of a small airplane, flying over water.  Beneath the airplane appear the words: Airamedic, llc. Air Ambulance, *We'll Take Care From Here!*

The brochure describes Airamedic as committed to providing your family with "the safest medical flight to your destination" and says the "medical and flight crew will be the highest trained and experienced with profession (sic) ethics and compassion that are unmatched."  The brochure states that "[s]afety, low cost, and highest quality of medical care and comfort are our primary goals when transporting your patient" and indicates that "we achieve those goals on every flight."  The brochure proclaims "Dedication to Excellence . . ." and says that "[w]e will get your patient home safe, sound, & on time . . ."

4

The Airamedic brochure observes that "[m]any air ambulance companies have had fatal air mishaps" and they are a "growing problem in this industry." Yet, Airamedic "take[s] pride in our company's record with no loss of life and no air mishaps." Airamedic asks "Is the least expensive doctor or hospital to care for your patients needs contacted?" It answers, "[p]robably not . . . It's the best and safest doctor and hospital for your family member's care."

The brochure asserts that "[w]hen arranging a medical flight for your patient, family members should take the highest precautions necessary for the patient's medical welfare AND provide the safest transportation for their loved one's return to his/her destination . . . along with offering the lowest rates in the industry." The bottom of this panel has Airamedic's telephone number and web address.

The top of the panel to the left contains another picture of an airplane, flying over clouds. Beneath the photograph appear the words in bold: "We understand . . ." Beneath these words appear:

> your family's and your patient's hardships at this trying time, and we are here to help you and carry your family's burden in coordination of all aspects prior to and after your loved one's medical flight is completed.
>
> We have made great efforts to lower our cost of aircraft transportation nationwide and worldwide. Now from just about all points worldwide we are successfully transporting your patients, their family members, at a fraction of industry cost.
>
> A vast data bank of critical care aviators who insure the safest and highest quality of service . . . and they help lower costs! We Also Offer Commercial Airline Escort Transportation at very low cost.

At the bottom of this panel is a photograph of the interior of an airplane and an email address for the company.

The panel to the right contains a three by three and a quarter inch photograph of three people. Most prominent is a male dressed in a white coat with writing over the left outside pocket, wearing a blue and white check shirt and a stethoscope. He is looking down at a young girl with blonde hair and bangs. Only the girl's face is clearly visible. The girl's head is resting against a pillow and she is in bed under a blanket and sheet. The girl appears to be clothed or perhaps in pajamas. She is looking directly at the person to the left of the photograph who is mostly turned away. This person's face is not distinguishable and she is mostly in shadow. Based on the length of hair, this person is likely a woman, though the person could be a male with long hair. She is wearing a blue shirt and is extending her right arm to use a stethoscope to listen to the girl's chest.

Across the bottom of the photograph are the words: "We'll Take Care From Here!" Under the photograph are the words in quotes: "Professional with Compassion." Under that statement appears the following:

> The flight was fabulous!! Everyone was professional and treated us with compassion. My mom said, "I think I've found the way I want to travel from now on." I wish I could come up with some amazing words to describe how amazing the whole experience was for us. The ambulance was waiting for us when we arrived here in Lansing. I thought it would be a long tiring day, but it wasn't for any of us.
>
> Thank you so much for everything. We will recommend you to everyone we know!! You were truly a blessing!
>
> Take care,
> Polly M.

Beneath those words are: "Helpful and Attentive," and beneath those words appears the following:

> The flight went well.  Everyone was very helpful and attentive to my mother's needs.  Jill, Quentin, and Ken were professional and courteous.  I was pleased with how the whole Med Flight was conducted.
>
> Chris B.
> Orlando, FL

### B. Sharon Rosecrans' Testimony

Sharon Rosecrans has lived in Fort Fairfield, Maine for ten years.  From 1991 to 1993, she worked as a flight nurse in New York for a company called Air Response.  Air Response had less than ten employees and one other flight nurse.  Ms. Rosecrans left Air Response on good terms.

During her employment with Air Response, she was asked to participate in a photograph and to bring her daughter, who was about four years old, to be the patient.  She identified the man in the photograph as the Medical Director of Air Response.  Ms. Rosecrans testified that she agreed to the taking of the photograph and she knew that it was going to be used by Air Response for commercial purposes to generate more customers.  She did not, however, sign any documents regarding Air Response's use of the photographs.

Ms. Rosecrans now works for a hospice in northern Maine.  Last year, the hospice received the brochure addressed to the Nurse Manager of her facility.  When Ms. Rosecrans looked at the brochure, she immediately recognized the photograph as one from the photo shoot in the early nineties.  Because her current employer received the brochure, Ms. Rosecrans assumed that the brochure was part of a mass mailing.

7

Ms. Rosecrans had never heard of Airamedic and she never gave Airamedic permission to publish her photograph.

Ms. Rosecrans was astounded that Airamedic had used such an old photograph and found it upsetting. She said it did not seem right. She talked about the situation with her co-workers and family, including her daughter who is now twenty-eight. She showed the brochure to her daughter about two weeks later.

Ms. Rosecrans thought about the brochure for quite a while afterwards. She went to Airamedic's website and the photograph was on the website as well. Ms. Rosecrans was bothered by the fact that Airamedic had placed the photograph on its website and was providing worldwide service. Ms. Rosecrans consulted an attorney who asked Airamedic to desist. Airamedic did not respond, but it did take the photograph down from its website. In the summer of 2016, her facility received a second brochure from a company with the same address as Airamedic under the name "Angel Flight." This brochure did not have the Rosecrans photograph.

From Ms. Rosecrans' perspective, the issue with the photograph has not been resolved and she views Airamedic's use of the photograph as disrespectful. At the same time, she agreed that she had not suffered any professional troubles as a result of the photograph.

### C. Lisa Weeks' Testimony

Lisa Weeks is Sharon Rosecrans' daughter. Her image as a young girl appears in the photograph. Ms. Weeks has lived in Bradley, Maine for about three years and

is currently a Ph.D. candidate at the University of Maine in the chemical engineering department.

During the summer of 2015, Ms. Weeks' mother called her at work, upset about the Airamedic photograph. Her mother told her that Airamedic had a photograph of them in its brochure and Ms. Weeks looked the company up online. Ms. Weeks had no memory of the photograph being taken and she recalled signing no legal consents about the use of her image.

Ms. Weeks saw the brochure about two weeks later. When she saw the brochure, she was astonished and she found it unnerving. She said she was upset and angry. Ms. Weeks was worried about the photograph being online and circulated. She explained that she is a very private person and that she is just building her career. She has deliberately avoided creating any online image. She does not belong to Facebook, MySpace, or similar online social media. In this regard, she acknowledged that she is not the typical Millennial and she views her reputation as the key to her future. Ms. Weeks worried about what else was out there on the internet, was anxious that perhaps other photographs had been taken, and was worried about the impact on her future career.

Ms. Weeks' mother told her about her former job as a flight nurse. She had not known much about her mother's employment history. Her mother told her about taking her to work and her getting to see a big plane. Ms. Weeks recognized herself as the child in the photograph, and she understood the photograph was staged.

Ms. Weeks was not sure if she ever visited the Airamedic website again, but she now understands that Airamedic took the photograph down from its website after an attorney intervened on their behalf. Ms. Weeks acknowledged that the fact Airamedic took the photograph down from its website made her feel better; however, she added that she would have welcomed a response from Airamedic. Finally, she acknowledged that the photograph itself is not unflattering.

## IV.  DISCUSSION

### A.  The Complaint

The Plaintiffs' Complaint contains one count, which alleges that Airamedic "appropriated for its own use or benefit Plaintiffs' likenesses." *Compl.* ¶ 18. The Complaint states that the "Plaintiffs did not consent and were not aware of Defendant's use of their photo until 2015 in Defendant's sales and promotional brochures throughout the United States and abroad." *Id.* ¶ 19. The Complaint further alleges that Airamedic "intentionally disregarded Plaintiffs' request that they not appear in the sales brochures, including on their website." *Id.* ¶ 20. They say the "Defendant's use of Plaintiffs' photo in brochures and on their website has caused, and continues to cause Plaintiffs emotional distress and other damages as set forth below." *Id.* ¶ 21. The Plaintiffs demand that the Court enter judgment against the Defendant and "award damages sufficiently large to compensate for damages they have suffered as a result of Defendant's conduct including, but not limited to, damages for general and non-economic damages, economic damages, pre-judgment and post judgement (sic) interest, lost wages, punitive damages, costs of this suit,

including reasonable attorney fees and costs, injunctive relief and such further relief the Court may deem proper." *Id.* at 3–4. The Complaint states that the Plaintiffs are proceeding for "**INVASION OF PRIVACY/MISAPPROPRIATION**." *Id.* at 3.

### B.     The Law

As this is a diversity action, this Court looks to Maine law for the elements of a misappropriation claim. *See Dempsey v. Nat'l Enquirer*, 702 F. Supp. 934, 936 (D. Me. 1989). In 1976, the Maine Supreme Judicial Court discussed misappropriation as being one of four interests subsumed under the tort of invasion of privacy. *Estate of Berthiaume v. Pratt*, 365 A.2d 792, 795 (Me. 1976). In *Berthiaume*, the Maine Law Court described misappropriation as "appropriation for the defendant's benefit or advantage of the plaintiff's name or likeness." *Id.* Quoting Professor William Prosser, the *Berthiaume* Court wrote that misappropriation "usually involves [publicity]." *Id.* (quoting W. PROSSER, LAW OF TORTS 814 (4th ed. 1971) (PROSSER)). Again quoting Professor Prosser, the Maine Law Court explained that misappropriation does not require "falsity or fiction," but it typically involves "a use for the defendant's advantage." *Id.* (quoting PROSSER, at 814). The Law Court observed that a plaintiff "need not plead or prove special damages" and that "[p]unitive damages can be awarded on the same basis as in other torts where a wrongful motive or state of mind appears, but not in cases where the defendant has acted innocently as, for example, in the mistaken but good faith belief that the plaintiff has given his consent." *Id.* (citations omitted).

The next year, in 1977, the Maine Supreme Judicial Court directly addressed a case involving the appropriation of a person's likeness. *Nelson v. Maine Times*, 373 A.2d 1221 (Me. 1977). In *Nelson*, a newspaper published a photograph of an infant and did so without the mother's or infant's consent. *Id.* at 1222. The Law Court quoted the Restatement (Second) of Torts § 652C as providing that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Id.* at 1223–24. Examining the photograph, which depicted a "young person set against a pastoral background," showed "no abnormality and suggest[ed] a young boy who appears to be content with his environment," and further suggested to the viewer that the "young lad was of Indian ancestry," the *Nelson* Court determined that these facts "do not bring this publication within the ambit of Section 652C." *Id.* at 1224.

The Maine Law Court explained that the protection afforded by the law "relates to ordinary sensibilities and cannot extend to supersensitiveness or agoraphobia." *Id.* (quotations omitted). In other words, "if a person reasonably constituted could anticipate that such an appropriation could cause mental distress and injury to another who was possessed of ordinary feelings and intelligence, such an appropriation would be tortious." *Id.*

In addition, the publication must "benefit the tortfeasor." *Id.*; *see Powers v. Pt Showclub*, No. CV-11-0267, 2011 Me. Super. LEXIS 216, at *8–9 (Me. Super. Ct. Aug. 23, 2011). In 2016, the Court of Appeals for the First Circuit noted a difference between "situations in which the defendant makes an incidental use of the plaintiff's

name, portrait or picture and those in which the defendant uses the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 27 (1st Cir. 2016) (quoting *Tropeano v. Atl. Monthly Co.*, 400 N.E.2d 847, 850 (Mass. 1990)).

### C. Sharon Rosecrans' Damages

It is difficult to know what to make of Ms. Rosecrans' claim for damages. Although it is true that no special damages are required to successfully assert a claim for invasion of privacy, this case is notable because not only are no special damages claimed, but there is also no evidence that any special damages could have potentially been incurred. During her trial testimony, Ms. Rosecrans expressly acknowledged that she consented to and participated in the photo session at Air Response in the early 1990s. She said the photo was staged and she knew that Air Response was going to use it for commercial purposes. Furthermore, Ms. Rosecrans' affidavit demonstrates that the "Defendant is a successor owner of Air Response, or the same owner as in 1992 with a different name." *Pls.' Second Default J. Mot.* Attach. 1 *Aff. of Sharon Rosecrans* ¶ 4 (*Rosecrans Aff.*).

Moreover, Ms. Rosecrans' face is not visible in the photograph and the brochure does not identify her by name. To know that the person in the photograph is Ms. Rosecrans, the person would have to recognize Lisa Weeks (whose face is visible) as Ms. Rosecrans' daughter and extrapolate that the figure in the photograph must have been Ms. Weeks' mother, perhaps because the person knew that Ms. Rosecrans once worked as a flight nurse. For a person to arrive at these conclusions, he or she would

have to have known Ms. Rosecrans extremely well and, given their familiarity with Ms. Rosecrans, would likely discount any negative implications from the photograph. By contrast, the average person would not be able to identify Ms. Rosecrans as the person in the photograph.  Nor is there anything remotely pejorative or scandalous about the photograph and its context.  To the contrary, in the brochure, Airamedic is praising the professionalism and dedication of its staff, including by implication Ms. Rosecrans.

The evidence indicates that after Ms. Rosecrans' attorney demanded that Airamedic stop using the photograph, Airamedic took the photograph down from their website.  The next brochure that Ms. Rosecrans received from Angel Flight, at the same address as Airamedic, did not contain the Rosecrans photograph.  At the same time, Airamedic never directly responded to the attorney's request.

Given these extremely benign circumstances, it is not surprising that Ms. Rosecrans has not had to seek medical or psychological attention nor lost any wages as a result of this misappropriation.  For Ms. Rosecrans to receive a brochure decades after a consented-to photo shoot with her barely visible image for a seemingly different air medicine company may have been mildly surprising, but it seems more like the photograph of the young boy in the *Nelson* case that the Maine Supreme Judicial Court determined did not fall within the ambit of misappropriation.

Nevertheless, with the entry of default, the well-pleaded allegations in the complaint are taken as true, except those relating to damages.[1]  *Thomson v. Wooster*,

---

[1]     Even after entry of default, a court may "still conclude that a complaint fails to state a claim." *Vázquez-Baldonado v. Domenech*, 595 F. App'x 5, 5 (1st Cir. 2015) (quoting *Feliciano-Hernández v.*

114 U.S. 104, 110–11 (1885); *In re The Home Rests., Inc.*, 285 F.3d 111, 114 (1st Cir. 2002); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2688.1 (4th ed. 2016).  Here, Ms. Rosecrans' Complaint alleges facts sufficient to establish liability on the part of Airamedic.  Even so, the allegations in the Complaint together with Ms. Rosecrans' trial testimony establish a damages claim on the edge of sustainability.  This is because Ms. Rosecrans' damages rely on her credibility, and the Court has a dim view of her reliability as a witness.  The Court is unable to reconcile Ms. Rosecrans' November 21, 2016 affidavit on this issue with her sworn trial testimony.  In support of motion for default judgment, she stated under oath:

> While in the employ of Air Response, a photo was taken by my employer in New York of then my minor daughter, Lisa, age 4, and of me.  I was not aware that my photo was taken.

*Rosecrans Aff.* ¶ 3.  She also stated: "Our photo was taken without my knowledge, consent, and approval."  *Id.* ¶ 5.

Yet when she appeared as a sworn witness before the Court on January 20, 2017, she testified that her former employer asked her to participate in the photo session and to bring her daughter, that the photo was staged, that she agreed to the taking of the photo, and that she knew that the photo would be used by Air Response for commercial purposes.  Furthermore, looking at the photograph in the brochure, it is hard to believe that Ms. Rosecrans did not know that her photograph was being taken.  She is holding a stethoscope on her daughter's chest and her daughter is looking directly at her while she is doing so.  It is obviously staged.  Finally, Ms.

---

*Pereira-Castillo*, 663 F.3d 527, 537 n.5 (1st Cir. 2011)).  However, the Court does not conclude that the facts as alleged in the Complaint in this case fail to state a claim.

Rosecrans' affidavit was submitted in support of a failed motion for default judgment, where—if granted—she knew its contents would not be challenged, making the statements in the affidavit more egregious.

As the extent of Ms. Rosecrans' damages is purely a function of her own say-so and the contradictions in her sworn statements give no credence to her credibility, the Court awards Ms. Rosecrans nominal damages of $1.00.

### D.   Lisa Weeks' Damages

Lisa Weeks' damage claim is on a different footing.  She was only four years old when her mother took her to the photo shoot and was obviously too young to consent to the taking of the photograph.  The Court skips over the knotty issue of whether her mother's conceded consent to Air Response on her behalf is sufficient to constitute consent to Airamedic now that Ms. Weeks is an adult; Airamedic failed to respond to her Complaint and her allegations against Airamedic are deemed admitted.

Unlike her mother's photograph, Ms. Weeks' face is clearly depicted in the photograph.  Even so, it would take an unusually perceptive person to recognize twenty-eight year old Lisa Weeks from the photograph taken when she was just four years old.  No doubt, she recognized herself and her mother recognized her.  But the range of people who would realize that current-day Lisa Weeks is the same person as depicted in the photograph must be miniscule and limited, perhaps, to close family members.  Those close family members would be the least likely to cause trouble to Ms. Weeks as a result of her Airamedic photograph.

The photograph of Ms. Weeks is of a very cute little blonde girl, looking at the person the Court now knows is her mother with a look of complete trust. This trusting look may have been the reason someone at Airamedic used it. There is nothing scandalous or unseemly about the depiction. Similarly, the brochure itself contains nothing even remotely derogatory or defamatory about Ms. Weeks. It does not identify Ms. Weeks or, as noted earlier, her mother. If someone who did not know Ms. Weeks or Ms. Rosecrans viewed the photograph, to the extent he or she concluded anything about the identity of the young girl, it might well be that the girl was connected with Peggy G. of Lansing, whose comments about Airamedic appear directly below the photograph. It is possible if the person made all the connections to Ms. Weeks, he or she might wonder whether Ms. Weeks at one point was so ill, she required the services of an air ambulance. But it is also likely that a person who made all of these connections would know Ms. Rosecrans and Ms. Weeks well enough to know better.

As with her mother, there is no evidence of special damages and, as noted earlier, there need not be as a matter of law. But it remains true that Ms. Weeks has not incurred any medical or psychological expenses as a result of the publication of the photograph, nor has she suffered any wage loss. As a doctoral candidate at the University of Maine's highly prestigious chemical engineering program, there is no sign that the photograph affected Ms. Weeks' professional career or her prospects. To the contrary, Ms. Weeks is a remarkably accomplished young woman with very bright prospects.

Unlike Ms. Rosecrans, there is no reason for the Court to discount the truth of Ms. Weeks' testimony.  Although it is difficult to understand how a person could misuse this photograph, the Court accepts Ms. Weeks' testimony about her vigilance regarding her internet reputation, her deliberate keeping a low profile on social media, and her concern that even a photograph as innocuous as the one on the Airamedic brochure can be misused.  Of course, ironically, by bringing this lawsuit and raising her claims, Ms. Weeks has likely brought more attention to the photograph and her connection with it than the pamphlet alone would have brought without the lawsuit.

Taking all the circumstances into account, the Court awards Lisa Weeks $1,000.00 in compensation.

**E.   Other Claims for Relief**

In addition to their claims for compensation, the Plaintiffs demanded that the Court enjoin Airamedic from continued use of the photograph.  As Airamedic has apparently already taken the photograph down from its website and replaced the photograph in its brochure, the Court declines to enjoin Airamedic to do something that it has already voluntarily done.  The judicial authority of the federal courts is constitutionally limited to actual cases and controversies, and the Court doubts there continues to be an actual harm that requires a remedy.  The Court dismisses this part of the requested relief without prejudice so that the Plaintiffs may reinitiate their request if necessary in the future.

The Plaintiffs also demanded that the Court issue a punitive damages award against Airamedic. However, the Court does not find that the Plaintiffs have demonstrated by clear and convincing evidence that Airamedic's conduct was actually malicious or that it was so outrageous that malice toward the Plaintiffs can be implied, the standard for punitive damages in Maine. *Caron v. Caron,* 577 A.2d 1178, 1180 (Me. 1990); *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me. 1985).

## V. CONCLUSION

The Court ORDERS Judgment to issue in favor of Sharon Rosecrans and against Airamedic, LLC in the amount of $1.00 and in favor of Lisa Weeks and against Airamedic, LLC in the amount of $1,000.00 plus interest and costs. The Court DISMISSES without prejudice the Plaintiffs' claim for injunctive relief and DENIES with prejudice Plaintiffs' claim for punitive damages.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2017